Argued 17 January, decided 26 February, 1907.

### GROESBECK *v.* GROESBECK.

88 Pac. 870.

FRAUD—CASE UNDER CONSIDERATION.

1. The evidence is ample to sustain the finding of the trial court that the deed executed by S. V. Groesbeck and wife to T. J. Groesbeck on April 2, 1902, was induced by fraud and undue influence and while S. V. Groesbeck was so mentally incapacitated as to be incapable of understanding his conduct, and said deed was properly canceled at the suit of the other children of S. V. Groesbeck.

CANCELLATION OF INSTRUMENTS—NEED OF RETURNING CONSIDERATION.

2. The object of returning the consideration received before setting aside a transfer for fraud is to place the parties as they were before the occurrence, and where the grantee has received during his possession an amount equal to what he paid, there is no occasion to return the consideration as a condition precedent to maintaining suit.

From Union: ROBERT EAKIN, Judge.

49 OR, ——

Statement by MR. CHIEF JUSTICE BEAN.

This is a suit for a decree declaring the plaintiffs Nicholas O. Groesbeck, Mary E. Packard, Jacob A. Groesbeck and Charles D. Groesbeck, each to be the owner of an undivided one-sixth interest in certain real property in Union County, and that the defendant holds the legal title to such interests in trust for them. The plaintiffs and defendant are the heirs at law of Stephen V. Groesbeck, deceased. In the spring of 1901, Mr. Groesbeck, at the solicitation of his children, sold 40 acres of land in Utah, and, through the agency of the defendant and one of the plaintiffs, invested the proceeds in a farm in Union County. At the time of this transaction, Mr. Groesbeck was about 75 years of age, well advanced in senile decay, and for three or four years had been practically incapacitated for the transaction of business. The sale of the Utah property, and the investment in Oregon, were made with a view of acquiring a larger tract of land which his children thought could be subdivided so as to afford homes for all of them. Soon thereafter some of the children moved to this state, took possession of the property, and stocked it with money furnished by their father. In July, 1901, the defendant moved to Oregon, and the father in October of the same year. The children seem to have been unable to agree among themselves, as a consequence of which all of them left the farm in the fall and winter of 1901, except the defendant and his brother, Thomas J. Groesbeck. In April, 1902, Stephen V. Groesbeck and his wife conveyed the farm to the defendant and his brother Thomas, subject to a mortgage of $3,800. Thomas thereafter conveyed his interest in the farm to the defendant, who, with his wife, on February 20, 1903, sold and conveyed it to Ruckman, subject to the mortgage, for the sum of $3,770, which, on the 21st of April following, they invested in the land now in controversy. Thereafter, Stephen V. Groesbeck and his wife having died, this suit was commenced for the purposes stated.

The complaint charges that the deed to the defendant and his brother was without consideration, and its execution was in-

duced by fraud and undue influence. For an answer to the complaint the defendant avers that for some years prior to the conveyance in question, he supported and maintained his father and mother, and looked after their property, and that the deed to him and his brother was made in consideration of such fact, and of the further agreement on their part to support and maintain their parents during the remainder of their lives, which agreement had been fulfilled. The plaintiffs had decree in the court below, and the defendant appeals.          AFFIRMED.

For appellant there was a brief over the names of *Charles Edgar Cochran* and *Crawford & Crawford,* with an oral argument by *Mr. Cochran.*

For respondents there was a brief with oral arguments by *Mr. Ira Everett Barber* and *Mr. John Wesley Knowles.*

MR. CHIEF JUSTICE BEAN delivered the opinion.

1. We are of the opinion that the decree should be affirmed. The evidence shows that prior to his removal to Oregon, and until his death, Stephen V. Groesbeck was in an advanced stage of senile decay, which, if it did not incapacitate him from intelligently transacting business, rendered him easily susceptible to the influence of those associated with him; that after the removal to Oregon, and after making it so disagreeable for the other children that they felt compelled to leave the place, defendant conceived the idea of obtaining a deed to himself and his brother Thomas for the Oregon property, and the circumstances under which such deed was made are thus related by Thomas:

"After John and I got the place to farm, and the other children got out and off of there, John proposed that we make father deed the place to us, as the other children were doing nothing to support the old folks, and we had them to take care of. There was some considerable talk like this, and finally, about April 2, John went to La Grande and got Sargent to come out and make the deed, and he did, and father and mother signed it. Father did not know what he was doing when he signed it; really, he did not sign it. Sargent took his hand and pushed

it along and made the signature. * * About a month or more before this first deed was made, he [defendant] began to ask father to deed to us, or, rather, to demand that he do it. Father did not seem to want to make it, and John would curse and abuse him and threaten him, handle him rough, and kept this up till along about the 1st of April, 1902, when father got mighty sick, and it looked like he was going to die. Then John said, 'I must get this deed fixed, father is liable to die any minute,' and, with an oath, said, 'if he dies the heirs can come in here and kick us off.' This was just before he brought Sargent and got the deed fixed. We paid Sargent $25 to come out and fix it, and, after we got the deed, John seemed well pleased, and said, 'We've got them by the heels now, and got a downhill pull, and see them get it if they can.' He talked a good deal like that, and seemed to have it on his mind quite a good deal. He said to me, 'You stay with me, and I'll fix you; but G—d d——n the rest.' This was shortly after the deed was made. * * John would demand a deed, and father would say, 'No,' or, much of the time, say nothing at all, and John would curse him and threaten to throw him out and go off and leave him, and kept this up till he got the deed to me and him. * *

"When father made deed to us, he was very sick, and we thought he was going to die soon. John and I both talked about it. He was barely able to sit up, and did not appear to have any idea of what was being done. He had gotten worse in his mind right along all the time since coming to Oregon, and some time after that, when it was talked about, said to me that he had not deeded the place to me and John, or to any one. * * I heard John talking to father most every day before the deed was made for a month. Heard their talk, and the only things said were asking for a deed, and demanding a deed, to which father seldom said anything. The only support talk was what John said to me as a reason for getting the deed. * * I know that the matter of support and maintenance never entered into the consideration for any deed father made in this matter. He was simply made to deed, and that is all there was to it. * * I was there all the time. Heard and saw all, or most all, the talk; and, if there had been such consideration, I would have known it. * * There was no consideration whatever moved from either myself, or my brother, the defendant, for the making of either of the deeds mentioned in this case. We were on father's farm, stocked with his money, receiving all the benefits save the little he got, and were better fixed to make money and get along than

we had been for many years. * * I bargained the interest I had in it to my brother John W. for $600, and he agreed to pay me this amount, but he never paid it, or any part of it. He did pay me $125 when I left there, which, I understood, was pay for work on the place in farming it, and which he may have called on the deed. In buying my interest, he counted it as a one-sixth interest."

. The testimony of Thomas Groesbeck concerning the defendant is corroborated by the testimony of other witnesses. Drs. Smart and Dunn, both of whom were acquainted with the elder Groesbeck while he resided in Utah, testified that for a period of three years or thereabouts, prior to his removal to Oregon, he had been in a condition of senile decay, and was a mental and physical wreck, without capacity to understand or intelligently comprehend the transaction of business. Dr. Richardson, a physician who saw him often a short time prior to the execution of the deed to the defendant, testified that he was then in an advanced stage of senile decay, and in such a mental condition as incapacitated him from the transaction of business. There are many other witnesses, intimate acquaintances, and relatives of the family, who testified to the same effect. Capitola Gunderson, I. C. Packard, E. L. Boren, Eldora Groesbeck and others testified to defendant's treatment of his father, and the influence he had over him. Under these circumstances it is clear that the deed executed by the elder Groesbeck to the defendant and his brother Thomas should be set aside and avoided by a court of equity: *Irwin* v. *Sample,* 213 Ill. 160 (72 N. W. 687) ; *Giles* v. *Hodge,* 74 Wis. 360 (43 N. W. 163).

2. It is argued, however, that before the plaintiffs can recover in this case they must do equity by repaying to the defendant the amount of the mortgage on the farm, and a reasonable compensation for the care and support of his father and mother after the execution of such deed. There is no evidence that the defendant paid or discharged the mortgage referred to. The land was conveyed by him to Ruckman, subject to the mortgage, and it was only that part of the consideration over and above the amount of the mortgage which was received by him and in-

vested in the property now in controversy. The defendant had the use of the farm, and received the rents, issues and profits thereof, which, so far as the record in this case discloses, were amply sufficient to compensate him for the support and maintenance of his father and mother.

The decree of the court below is affirmed.            AFFIRMED.

Mr. Justice EAKIN, having presided at the trial in the court below, took no part in this decision.